UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDREW BOURNE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 1:03-cv-1375-DFH-VSS |
| ) | |
| MARTY GILMAN, INC., ) | |
| ) | |
| Defendant. ) | |

ENTRY ON MOTION FOR SUMMARY JUDGMENT

After the Ball State University football team won an upset victory, hundreds of fans ran onto the field to celebrate. Some climbed on the goal posts to tear them down. Plaintiff Andrew Bourne was a Ball State student and among those on the field. One goal post collapsed under the weight and rocking motion of celebrating fans. The goal post fell on Bourne and paralyzed him permanently below the waist.

Bourne and his parents reached a separate settlement with Ball State University, which actually invited fans to rush onto the field and tear down the goal posts. In this action, however, Bourne and his parents have sued the manufacturer of the goal post, Marty Gilman, Inc., under the Indiana Products

Liability Act on the theory that the goal post was defective. The court has diversity jurisdiction under 28 U.S.C. § 1332.

Defendant has moved for summary judgment. As explained below, the court grants the motion. The undisputed facts show that the goal post was not unreasonably dangerous. Bourne and any other reasonable observer at the scene knew the mob of students were trying to pull the goal post down. The general risk of injury posed by a falling 40-foot tall structure of metal pipe was obvious to any reasonable observer, so the goal post was not unreasonably dangerous under Indiana law. Under Indiana law, evidence that the manufacturer might have designed a product to be more resistant to predictable destruction and vandalism does not alter the conclusion that the danger here was obvious to any reasonable observer. As a result, the product was not defective under Indiana law.

*Undisputed Facts*

In considering a motion for summary judgment, the court does not try to determine the credibility of conflicting evidence. Instead, the court must consider all evidence in the light reasonably most favorable to the non-moving parties, giving them the benefit of conflicts in the evidence and any favorable and reasonable inferences that could be drawn from the evidence. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Construing the evidence in that light,

the court assumes the following facts are true for purposes of defendant's motion for summary judgment.

On October 20, 2001, the Ball State football team played the University of Toledo at the Ball State field. In the waning moments of the game when it was apparent that Ball State would post an upset victory, the Ball State scoreboard operator saw fans gathering and expected them to tear down the goal posts after the game. She caused a pre-programmed message to appear on the scoreboard saying "the goal posts look lonely," or words to that effect. Tucker Dep. at 10-11. This message was intended to encourage fans to enter the field and tear down the goal posts, though the operator did not notice any fan reaction to the message. *Id.* at 8-11.

Andrew Bourne did not have a ticket to the Ball State–Toledo game. He spent most of the game "tailgating" with some friends in a field outside the stadium. Ball State apparently allows fans to enter football games without tickets late in the fourth quarter. Bourne and his friends entered the stadium without tickets late in the fourth quarter. Bourne had been drinking beer. His blood-alcohol level tested after the injury was 0.13 percent.

Ball State did not have security personnel or other measures in place to prevent or discourage fans from running onto the playing field as the game ended. Bourne saw fans running onto the field when he entered the stadium. Bourne

was at the south end of the field when he stepped over a three-feet high wall and onto the field. A large crowd had already gathered in the end zone around the goal post. Many of those in the crowd were pushing and pulling at the goal post in an effort to bring it down. Some fans had climbed onto the goal post and started to bounce and to rock it. Bourne did not participate directly in the effort to bring the goal post down. He walked under the goal post and jumped up, attempting to swat the cross bar, but he missed. He stood there a moment, looking for his friends in the crowd. When he failed to spot them, he took a few steps toward the other end of the field, with his back to the goal post. Bourne then heard a snap and felt an impact across his back. He recalls feeling a tremendous amount of weight and pressure on his back. He suffered a fractured leg and a spinal injury that left him permanently paralyzed below the waist.

Defendant Marty Gilman, Inc. ("Gilman") has been manufacturing football goal posts since 1960. The now-familiar "slingshot" style goal post was developed in 1969. The slingshot style incorporates a single vertical stem supporting a horizontal cross bar and two vertical upright posts. The vertical stem is curved to allow its base to be set back from the playing field, reducing injuries to football players. The "slingshot" style replaced the older "H" style goal post, which used two vertical support posts in or on the edge of the playing field.

Ball State University has used Gilman "slingshot" style goal posts since at least the mid 1990s. The Gilman goal posts used by Ball State weigh

approximately 470 pounds each and cost approximately $4,700 per pair. They are made from aluminum and are fastened to the field by being bolted to a ground-level anchor plate. Each structure is 40 feet tall. The cross-bar is 18 1/2 feet wide and 10 feet above the ground. The two vertical posts are 30 feet long.

Gilman changed the metal alloy used in constructing the goal post model at issue when it took over production from the original designer of the goal post in 1985. Gilman Dep. at 121-22. Neil Gilman, president of Marty Gilman, Inc., testified that the new metal was "softer," *id.* at 122, and that the old alloy was more resistant to bending under the weight of students. *Id.* at 125. The company chose to switch to the softer metal because the specialized bending machine owned by the company could not satisfactorily bend the older alloy to create the curved vertical stem. *Id.* at 124, lines 16-25, at 125, line 1. Plaintiffs' expert Vaughn Adams described the new alloy as prone to fracture under the weight of celebrating fans. Adams Aff. ¶ 15.[1]

Gilman has long been aware of the practice of celebrating fans tearing down goal posts. Gilman Dep. at 91. Gilman was aware that the main stem of its own slingshot style goal posts could "snap" under the weight of celebrating fans. *Id.*

---

[1]Vaughn Adams has a B.S. in Engineering Design, an M.S. in Human Factors Engineering, and a Ph.D in Safety Engineering. His principal areas of research, teaching or consulting include: Human Factors Engineering, Systems and Product Design, Consumer Product Risk Analysis, Hazard Quantification in Product and System Design, and System Quantification Techniques such as failure mode and effects analysis. He conducted a safety engineering analysis of the events surrounding Andrew Bourne's injury.

at 92. Gilman was also aware that fans standing on the field when goal posts are being torn down are at risk of injury. *Id.* at 93-94. Gilman has not considered any engineering measures to reduce this risk, *id.* at 138-39; has not consulted outside sources regarding materials, engineering or safety issues related to its goal posts, *id.* at 43-44, 46, 129; and has not tested its goal posts to determine a breaking point, *id.* at 90.

Gilman was aware that sixteen sets of college football goal posts were torn down by fans in 2000, ten goal posts in 2001, seventeen in 2002, and twelve in 2003. Gilman Dep. at 58-59, 141. Neil Gilman was quoted in an ESPN.com article as saying: "I keep a real sharp eye on where the goal posts go down, I'm always rooting for the underdog." Adams Aff. ¶ 12, Ex. D.

On two occasions before Bourne's accident at the Toledo game – in 1996 and again in 2000 – fans tore down the Gilman goal posts at the Ball State field. In both instances, the goal posts broke at the vertical stem, just above the anchor plate. Byrnes Dep. at 21-22. The Gilman goal post that broke and struck Bourne on October 20, 2001, was the same slingshot style made of the same aluminum alloy as the Gilman goal posts that Ball State fans tore down in 1996 and 2000. The goal post that struck Bourne broke in the same location – low on the vertical stem just above the anchor plate – as those that broke in 1996 and 2000. Byrnes Dep. at 18-19, 22. Gilman concedes that this point is the weakest point on the

Gilman goal post and that, historically, this point is where the Gilman goal posts tend to break under the weight of fans. Gilman Dep. at 76.

Before Bourne's injury in 2001, there had been significant safety innovations in the manufacture of goal posts. In the early 1990s, the University of Iowa developed a "hinged" goal post that can be lowered to the ground at the end of a game, eliminating the opportunity for fans to tear it down. Adams Aff. ¶ 22. Also, Merchants Environmental Industries, Inc. ("MEI") manufactures a goal post it describes as "fan resistant" or "indestructible." It is made from structural steel as opposed to aluminum and is based in a substantial underground concrete footer rather than bolted at ground-level. A handful of universities use MEI "indestructible" goal posts. Adams Aff. ¶¶ 18-19. Purdue University has also developed an "indestructible" style goal post. In the late 1990s, a slingshot style goal post was developed by Washington State University with a double vertical stem to increase strength and improve weight distribution to support a greater load of people without collapsing. Adams Aff. ¶¶ 20-21. Additional facts are noted below, keeping in mind the standard that applies on summary judgment.

*Discussion*

The Indiana Products Liability Act ("IPLA") governs "all actions that are: (1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1.[2]

The IPLA provides in part:

> [A] person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer . . . is subject to liability for physical harm caused by that product to the user or consumer [if] that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition.

Ind. Code § 34-20-2-1. Under the IPLA, plaintiffs must prove: (1) the product was "defective" and as a result "unreasonably dangerous"; (2) the defect existed at the time the product left the defendant's control; (3) the product was expected to and did reach the consumer without substantial alteration; (4) the plaintiff's injuries were proximately caused by the defect in the product. *Moss v. Crosman Corp.*, 136 F.3d 1169, 1171 (7th Cir. 1998).

---

[2] This section was amended in 1995 and recodified in 1998 to apply to all product liability claims. See *Butler v. City of Peru*, 733 N.E.2d 912, 918 n.2 (Ind. 2000), citing Pub. L. No. 278-1995, § 1, 1995 Ind. Acts 4051, and Pub. L. No. 1-1998, § 5, 1998 Ind. Acts 125. As a result, plaintiffs may not pursue a separate common law negligence claim. Their negligence claim is not dismissed but is more properly merged with the statutory claim under the IPLA, which includes elements of negligence. See *Chesnut v. Roof*, 665 N.E.2d 7, 10 (Ind. App. 1996).

Defendant has moved for summary judgment under the first of these four elements, arguing that as a matter of law its goal post was neither defective nor unreasonably dangerous. The IPLA provides that the term "unreasonably dangerous" "refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind. Code § 34-6-2-146. "Consumer" is defined to include "any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." Ind. Code § 34-6-2-29. Under this definition, the students who rushed the field at the end of the Ball State – Toledo game were "consumers" of the goal post.[3]

Defendant asserts that the goal post was not unreasonably dangerous under the IPLA because the danger faced by Andrew Bourne and other bystanders was "open and obvious" as a matter of law. Under the IPLA, whether a defect is

---

[3]Gilman points out that football goal posts are designed to have footballs kicked through them, not for climbing. For purposes of this decision, however, the court assumes that goal post manufacturers can reasonably expect that fans will try to tear down their goal posts from time to time. Bourne has presented ample evidence of this custom. Because manufacturers can reasonably expect such efforts to destroy goal posts, the statutory affirmative defense of misuse does not apply here. See Ind. Code § 34-20-6-4 (affirmative defense to product liability claim if "a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party"); *Barnard v. Saturn Corp.*, 790 N.E.2d 1023, 1028-31 (Ind. App. 2003) (affirming summary judgment for manufacturer where car owner misused jack to lift end of car).

open and obvious is relevant to the inquiry into whether a product was unreasonably dangerous. *Lovell v. Marion Power Shovel Co.*, 909 F.2d 1088, 1090-91 (7th Cir. 1990), citing *Koske v. Townsend Engineering Co.*, 551 N.E.2d 437, 446 (Ind. 1990); *Welsh v. Scripto-Tokai Corp.*, 651 N.E.2d 810, 815 (Ind. App. 1995) (relative obviousness of a defect is relevant in determining whether a product is unreasonably dangerous), citing *Miller v. Todd*, 551 N.E.2d 1139, 1143 (Ind. 1990).

"[T]o be unreasonably dangerous, a defective condition must be hidden or concealed." *Cole v. Lantis Corp.*, 714 N.E.2d 194, 199 (Ind. App. 1999). If a defective condition is open and obvious, then it does not present a risk of injuries "different in kind" from those the average user might anticipate. The test is an objective one, based on what the user or consumer should have known. *Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 939 (Ind. App. 1994). Defendant contends that "an objective person would have been well aware of the dangers that he faced by standing in the area of a goal post being rocked by college students." Def. Br. at 13. The court agrees.

First, as an objective matter, any reasonable observer on the scene would have recognized the danger that the goal post would fall under the weight of the fans climbing on it and rocking it back and forth. Pulling down the goal post is what Ball State effectively invited and expected the fans to do. Bourne himself

-10-

testified that he was not surprised the goal post came down. Bourne Dep. at 19-20 and 55.

Second, the risk that a person might be hurt by a 40-feet tall metal structure falling under the weight of a dozen or more people was obvious, as a matter of law, to any reasonable observer on the scene.[4] The test of unreasonable danger is an objective one. The court "must take into account 'the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users.'" *Moss v. Crosman Corp.*, 136 F.3d at 1175, quoting *Koske*, 551 N.E.2d at 440.

Indiana courts have decided as a matter of law that products were not unreasonably dangerous in cases involving similarly obvious dangers. These include the danger posed by a butane cigarette lighter, *Welch*, 651 N.E.2d at 814 (affirming summary judgment; "the ordinary adult consumer contemplates the risks posed by a lighter, including the dangers associated with children who play with lighters"); the risk that a running rotary lawnmower blade would cut a hand stuck beneath the mower, *Ragsdale v. K-Mart Corp.*, 468 N.E.2d 524, 527 (Ind. App. 1984) (affirming summary judgment; the blade "poses an open and obvious danger as a matter of law to one placing a hand into the running mower,

---

[4] The dozen or more people on the goal post are visible most clearly on the end-zone camera view on the videotape, Def. Ex. 7.

particularly after the user has lifted the guard chute from its protective location")[5]; the risk that a metal crane would conduct electricity from overhead wires to injure or kill the operator, *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 624-26 (7th Cir. 1995) (affirming summary judgment); and the danger that a BB gun would injure a person shot with it, *Moss v. Crosman Corp.*, 136 F.3d at 1175 (affirming summary judgment).

The same reasoning applies here. Bystanders on the scene saw a 40-feet tall structure of metal pipes with a dozen or more adults climbing on it and bouncing and rocking it back and forth with the obvious intent to cause it to fall. The risk of injury to those below the goal post was obvious as a matter of law.

Plaintiffs' efforts to avoid this reasoning are not persuasive. First, Bourne's testimony that he thought he was in a safe position because he had seen goal posts come down slowly on television does not address the fact that the test is an objective one. See *Moss*, 136 F.3d at 1175; *Schooley*, 631 N.E.2d at 939.

---

[5]*Ragsdale* has been described as "abrogated" by *Koske v. Townsend Engineering*, 551 N.E.2d at 441, which abrogated the "open and obvious" rule under earlier product liability law. As noted above, however, the same considerations remain relevant in determining whether a product is "unreasonably dangerous," meaning it is in a condition that "exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer." Ind. Code § 34-6-2-146. Accordingly, *Ragsdale* still provides helpful guidance on Indiana law as to when a product is unreasonably dangerous.

Second, plaintiffs argue that a reasonable person on the scene could have expected that the goal post would come down slowly. Plaintiffs do not go so far as to claim that a reasonable fan would have been confident that the goal post could be pulled down without injury to anyone on the scene. Their argument is that the Gilman goal post was defective because it snapped (the court must assume for now) rather than bent. Plaintiffs' expert Adams testified that media coverage tends to emphasize the celebration rather than the risk, and that broadcasts "often" show goal posts coming down slowly. Adams Aff. ¶ 34.

Plaintiffs' argument seeks to require more specific awareness of the degree of risks than Indiana law actually requires. *Moss v. Crosman* and *Anderson* provide tragic but clear illustrations of this point. In *Moss*, a child shot a BB gun at another child. The air-powered projectile pierced the child's eye, entered his brain, and killed him immediately. 136 F.3d at 1171. The victim's parents sued the gun's manufacturer. They conceded that a reasonable person would understand that the gun could injure someone, but they argued that a reasonable person would not expect that the danger could be fatal. The Seventh Circuit affirmed summary judgment for the manufacturer because the difference was one only of degree. The fact that a reasonable person would understand the general type of risk was enough to show that the product was not unreasonably dangerous. 136 F.3d at 1175.

*Moss* followed the reasoning of *Anderson*, in which an electrician was killed when the metal crane and bucket in which he was working came into contact with overhead electrical wires. Plaintiffs acknowledged that reasonable persons (and the decedent himself) would understand there was a risk of electrical shock. They argued that this understanding did not reach so far as to include the possibility of a fatal electrocution. The Seventh Circuit rejected the argument, affirming summary judgment for the crane manufacturer. "The question becomes whether the difference between an electrical shock and electrocution is one of kind or degree. We answer that the difference is one of degree. Anderson experienced an initial shock of electricity while standing in the metal basket attached to the steel crane. He was aware that an amount of electricity could surge through his person. The fact that a fatal amount of electricity surged through him is a matter of degree, not a matter of a completely different injury." 67 F.3d at 625.

Similarly here, the general danger that a tall structure of metal pipes could injure someone as it fell under the weight of fans was objectively obvious to a reasonable bystander. The fact that Bourne's injuries were so serious is very unfortunate. But his injuries are not different from the general type of injury that a reasonable bystander would understand.

Plaintiffs have also offered evidence that fans lack awareness of the weight of goal posts or their various modes of failure. Adams Aff. ¶ 34. The court assumes that is true. That evidence does not address the relevant standard,

-14-

which is whether a reasonable bystander would understand the general type of risk posed by the falling goal posts. *Moss* did not require evidence that consumers would understand the details of the air-gun's muzzle velocity or the weight and shape of the projectiles. *Anderson* did not require evidence that electricians and other users would understand the details and limits of the crane's electrical conductivity.

Plaintiffs rely on *Corbin v. Coleco Industries, Inc.*, 748 F.2d 411 (7th Cir. 1984), in which the Seventh Circuit reversed summary judgment for a manufacturer of an above-ground pool. The plaintiff had assembled the four-feet deep pool and then dived into it. He broke his neck and was permanently paralyzed. The Seventh Circuit found that a factual issue was presented as to whether a warning was required, based on evidence that some users would believe it was possible to dive safely, with a flat, shallow dive. *Id.* at 417-18. On the product defect claim under a prior version of the Indiana statute, the court also stated in language that plaintiffs quote: "Whether a product is in an unreasonably dangerous defective condition is a question of fact." *Id.* at 419.

In the two decades since *Corbin* was decided, however, the case law discussed above shows that the question may be decided in a proper case as a matter of law, especially if the alleged danger is open and obvious, as with the risk that a lighter will start fires, the risk that a running lawnmower blade will injure a hand stuck underneath the mower, and the risk that a BB gun will injure. In

-15-

*Corbin*, the Seventh Circuit also relied on evidence that the pool contained a feature that made it deceptively dangerous. The plaintiff in *Corbin* had intended to make a flat, shallow dive, but there was evidence that the side of the pool was weak and would wobble under the pressure of a dive, so as to throw the diver off balance unexpectedly. *Id.* at 420. There is no comparable evidence here.

The court has considered plaintiffs' evidence showing that there are stronger designs for goal posts, such as the supposedly "indestructible" goal post sold by MEI (which has been destroyed by at least one determined crowd). The court assumes for purposes of summary judgment that there were safer designs available at the time of the sale of this goal post to Ball State. Indiana courts have held, however, that a manufacturer is not obliged to build the safest possible product, at least where the danger in question is known to a reasonable consumer. *Anderson*, 67 F.3d at 625 n.5, citing *Welch*, 651 N.E.2d at 815 n.5 ("if a product is not dangerous to an extent beyond that contemplated by the ordinary consumer, the fact that the product could have been made safer does not establish liability"). As applied here, this principle means that manufacturers are not required to sell only the safest goal post design, at least where the risk of injury is apparent to a reasonable bystander.

*Conclusion*

Andrew Bourne's life changed forever when other fans succeeded in pulling the goal post down. As noted, Bourne and his family have settled with Ball State University, which invited fans to tear down the goal post. That settlement was governed by the Indiana Tort Claims Act, which imposes a $300,000 cap on damages. The Indiana legislature has not raised that amount since 1974. Since then, inflation has cut the purchasing power of $300,000 by nearly 75 percent, so that a dollar today buys approximately what 25 cents bought in 1974. The cap today would need to be approximately $1.2 million to allow the same help to a seriously injured person that the cap allowed in 1974. The medical care price index, which may be more relevant for someone in Bourne's situation, has risen even more sharply. The plaintiffs' effort in this case, however, to hold the goal post manufacturer responsible for Bourne's injuries is not supported by law. The undisputed facts show that the Gilman goal post was not unreasonably dangerous. Defendant's motion for summary judgment is hereby granted, and final judgment shall be entered.

So ordered.

Date: July 20, 2005

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Ryan Hodge Cassman
SCHULTZ & POGUE

rcassman@schultzpoguelaw.com

Eric C. McNamar
SCHULTZ & POGUE, LLP
emcnamar@schultzpoguelaw.com

W. Scott Montross
TOWNSEND & MONTROSS
townsendmontross@aol.com

Thomas R. Schultz
SCHULTZ & POGUE
tschultz@schultzpoguelaw.com

John F. Townsend III
TOWNSEND & MONTROSS
townsendmontross@aol.com